IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CLEVELAND-CLIFFS IRON COMPANY, *et al.*, | ) ) ) | CASE NO.  1:15 CV 63 |
| Plaintiffs, | ) ) | |
| v. | ) ) | JUDGE DONALD C. NUGENT |
| ESSAR STEEL ALGOMA INC., | ) ) | |
| Defendant. | ) | MEMORANDUM OPINION |

This matter is before the Court on Plaintiffs, The Cleveland-Cliffs Iron Company, Northshore Mining Company, and Cliffs Mining Company's (collectively "Cleveland-Cliffs") Motion for Partial Summary Judgment.  (ECF # 37).[1]  Plaintiffs seek summary judgment in their favor on their claim for breach of contract relating to Defendant's nomination of annual requirements (Complaint Count One), and on Defendant's counterclaim for excess moisture

---

[1] The docket numbers cited in this Opinion may sometimes reference the redacted versions of the documents filed on the public docket.  The Court, however, has reviewed and considered the sealed, un-redacted versions of these documents in making its decision.

(Counterclaim Count Four).[2]  Defendant Essar Steel Algoma Inc. ("Essar") filed a brief in opposition, Plaintiffs filed a reply in support of their motion, and Defendant filed a sur-reply. (ECF # 46, 49, 54-1).  The parties also argued their motions to the Court at a status conference held on October 6, 2015.  Having considered all of the arguments of the parties, and having reviewed the undisputed facts and applicable law, the Court finds that Plaintiffs' motion should be GRANTED in part and DENIED in part.

## **Facts**[3]

Cleveland-Cliffs and Algoma Steel Inc, succeeded by Essar Steel Algoma Inc. ("Essar"), entered into an agreement for the sale and purchase of iron ore pellets in 2002.  The Pellet Sale and Purchase Agreement ("Agreement") is a long term installment contract that has been amended several times and extended through 2024.  The issues currently before the Court relate to the contractual terms addressing Essar's purchase requirements for 2014 and Cleveland-Cliffs' alleged excessive billing based on understated moisture content in the delivered iron ore pellets.

Count One of Cleveland-Cliffs' Complaint states a claim for an alleged breach of contract based on Essar's annual requirements nomination for the 2014 calendar year.   Under the Agreement, Essar is required to notify Cleveland-Cliffs by November 1 of the amount of iron ore

---

[2] Cleveland-Cliffs has since filed an Amended Complaint, however, the parties have agreed that this motion is unaffected by the amendments contained therein.

[3] Except as otherwise cited, the factual summary is based on the parties' statements of fact. Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to Defendant, the non-moving party.

it agrees to purchase for the following calendar year.  At the end of 2013, Essar timely notified Cleveland-Cliffs that it would purchase 4.0 million gross tons of iron ore during 2014.  By the end of 2014, Essar had paid for only 3.3 million gross tons of iron ore.

During March and April of 2014, both parties began to negotiate an amendment to the Agreement that would resolve, among other things, an on-going conflict relating the credits Cleveland-Cliffs allegedly owed Essar, as well as a reduction in the annual requirements amount Essar was obligated to purchase during 2014.   The negotiations were conducted orally, in person, and via email communication.  Terrence Mee is the Executive Vice President of Global Commercial and manager of Cleveland-Cliffs' global iron ore and coal marketing and sales, including sales to Essar.  He is the person Essar had traditionally notified regarding its annual requirements nominations and any alterations thereto.  (ECF #35-4,5,6: Mee Aff. Ex. 2- 4).  In April of 2014[4], Mr. Mee sent an email to Essar outlining a proposed agreement on certain terms to be included in the Amendment under negotiation.  One of the terms was a reduction in Essar's annual purchase nomination from 4.0 million down to 3.3 million gross tons of iron ore, including an allowance that 50,000 tons could be carried over through January 10, 2015.  (ECF #35-12: Mee Aff. Ex. 10).  The other terms were that an Fe true up would be agreed to by Essar "in advance of signing the definitive amendment and then the agreed Fe true up will be deducted from any credit that may be paid," and that the amendment would include a mutual release.  Essar responded to this communication the same day stating that "[w]e are in agreement" on these three terms.  (Id.)  Later communications call into question whether the parties actually believed that this correspondence had effectively altered the annual purchase nomination for

---

[4] An agreed Amendment was never executed during 2014.

-3-

2014, or otherwise established a contractual agreement. (ECF #35-13, 14, 15: Mee Aff. Ex. 11-13). The parties agree that no amendment to the Agreement was executed following the 2014 negotiations. Essar also claims that Cleveland-Cliffs shipped iron ore that had a higher moisture content than Cleveland-Cliffs disclosed through its reports and that the price they paid for the shipped pellets should have been reduced based on the added moisture content. The parties disagree as to whether Essar notified Cleveland-Cliffs that they believed the moisture levels were misrepresented, and disagree as to whether the Agreement allows Essar to recover for any alleged overcharges based on miscalculations of the moisture content in the shipped iron ore.

## Summary Judgment Standard

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as

an automatic grant of summary judgment, where otherwise appropriate. *Id.*

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). FED. R. CIV. P. 56(e) also has certain, more specific requirements:

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225-26 (citations omitted). However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist

-6-

unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## Analysis

### I. Breach of Contract (Count I)

Cleveland-Cliffs has brought a claim for damages alleging that Essar is liable for 700,000 tons of iron ore that it originally agreed to buy, but did not purchase in the year 2014. The parties agree. There are three ways that a nominations or "annual requirements" amount may be altered once established:

(1) by an Amendment or modification of the Sale Purchase Agreement;

(2) by notice to Cliffs pursuant to Section 5(b)(I) or (ii) of the Sales Purchase Agreement; or

(3) by an otherwise binding contractual agreement to modify the nomination.

Further, the Agreement provides a specific Force Majeure defense to any liability for damages stemming from an alleged failure to accept and pay for the full nomination amount to the extent that the failure was caused by a Force Majeure. The Agreement defines a Force Majeure in relevant part as a failure of Essar's facilities to produce steel, caused directly or indirectly by an

act of God, delay on the railroads, docks or in transit, or other causes beyond the control of Essar.

Cleveland-Cliffs argues, and Essar does not dispute that no amendment to the Agreement was executed during 2014, and the formal amendment or modification requirements were not met by the April 2014 email exchange between the parties. Essar explicitly stated during arguments in the October 6, 2015 status conference that it was not alleging that the parties had agreed to amend the Agreement.[5] Essar instead claims that the parties contractually modified the annual requirement nomination by agreeing in April of 2014 to a reduction from 4 million tons to 3.3 million tons to be purchased. Further, if this did not rise to the level of contractual modification to the nomination, Essar argues that the communications related to the reduction of the annual requirement satisfied the requirements of Section 5(b)(ii) of the Agreement, effectively altering its nomination by at least the 5% (200,000 tons) allowed under that section. Finally, Essar argues that even if there was a technical violation of the annual requirement provisions of the contract, Cleveland-Cliffs is not entitled to any damages because it received payment in full for 4.0 million tons of ore at the 2014 rates, and because Essar's ability to transport pellets and produce steel during the winter months of 2014 were caused by an act of God, and that damages are, therefore, precluded under the Force Majeure provision of the Agreement.

Cleveland-Cliffs contends that the terms set forth in the April email and other oral exchanges were simply starting points in an attempt to negotiate a global resolution to a variety of outstanding issues, including disagreements over credits owed and a revision of the annual

---

[5] Rather, Essar stated that is arguing that the parties contractually agreed to amend the nomination amount. The nomination amount for the annual requirement is not an included provision of the Agreement, but is created annually by a different writing.

requirement nomination. As such, they contend that there was no meeting of the minds on essential terms, and no consideration provided by either party which would create a binding contract.  Essar argues that the April email exchange constituted an offer and acceptance of specific terms relating to the reduction in the nomination amount, and that it provided consideration for the reduction by waiving a claim against Cleveland-Cliffs for over $23,000,000.00.

A contract requires an offer, acceptance, and consideration.  It is not enforceable where there has been no meeting of the minds regarding the essential terms of the contract. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 3-4 (2001)**.**   The terms must be "reasonably certain" and must provide some basis not only for determining whether there has been a breach, but also for determining an appropriate remedy.  Restatement (Second) of Contracts § 33 (1)-(2).  While Mr. Mee did ask for agreement on the three terms set forth in his April 22, 2014 email, and Essar did agree to these three terms, there was no consideration provided for this agreement and the terms outlined within the emails were not sufficiently certain on the essential terms.  There is no mention in the plain language of the stated terms of any waiver by Essar of a $23,000,000.00+ debt Essar claims is owed by Cleveland-Cliffs.  There is no agreement as to what the Fe true up amount would be, what amount would be deducted, or what amount of credit was owed or paid.  There is mention of a mutual release, but no definition of what either side would be releasing.  In addition there is a confirmation that there were still unresolved concerns about Essar's financial status, and no agreement on the number of vessels to be moved or whether financing terms would be accepted.  In fact, the only clear and specific term is the reduced nomination amount, but outside of acceptance of a broader global agreement, which never came to fruition, there is no mention of

-9-

any consideration that was offered or tendered as consideration for Cleveland-Cliffs' acceptance of a reduced nomination. Therefore, this Court finds, as a matter of law, that the April email exchange was not sufficient, as a matter of law, to create a binding contract between these two parties as to any of the terms outlined in those communications.

The lack of a formal amendment or modification to the Agreement, and the lack of a separate enforceable contract modifying the nomination does not fully resolve the question of whether the annual requirements nomination was effectively modified, however. Section 5(b)(I) of the Agreement allows Essar to modify its good faith estimate of its Annual Requirements by up to 10% if it provides notice to Cleveland-Cliffs not later than January 10 of the year in question, and by up to 5% if it provides notice to Cleveland-Cliffs not later than July 10 of that year. (Agreement, Section 5).[6] Essar has submitted evidence in the form of the above-mentioned emails supporting its position that it notified Cleveland-Cliffs that it was reducing its annual requirements no later than April 22, 2014, prior to the July 10th deadline for a 5% reduction. Although this would not excuse the entire alleged deficiency, it would reduce Essar's potential liability by 200,000 tons. There are questions remaining as to whether this email exchange satisfies the notice requirements of the Agreement, but at this juncture the Court cannot say, as a matter of law, that these emails do not constitute acceptable notice for at least a 5% reduction in

---

[6] Pursuant to the Agreement, any notice required under the Sales Purchase Agreement must be in writing and "either personally served on an officer of the party hereto to whom it is given, or sent by recognized overnight delivery service, mailed by registered or certified mail, postage prepaid, or by facsimile" to the addresses stated in the Agreement. (Agreement ¶ 17). The Agreement does not specify email as a valid means of providing notice, however, prior notices of nomination amounts and modifications submitted by Plaintiffs as examples of proper notice are marked SENT VIA EMAIL, thereby appearing to have been communicated solely by email. (ECF #35-4,5,6,8,9: Mee Aff. Ex. 2-4, 6-7).

-10-

the agreed purchase amount.

Finally, there also remain questions of fact as to whether under the Force Majeure clause Essar is subject to any liability for damages stemming from its alleged failure to meet its annual requirements nomination amounts for 2014, and whether any outstanding damages remain following any allowable off-sets for alleged over-billing caused by Cleveland-Cliffs' use of the 2014 pricing structure in its 2015 sales. For all of these reasons, the Court finds that Essar failed to meet its annual requirements by a margin of at least 500,000 tons, and there was no legally enforceable agreement between the parties to reduce the 2014 annual nomination to 3.3 million tons. However, because the Court cannot determine, based on the evidence currently before it, whether Essar was short 500,000 or 700,000 tons from its final nomination, and cannot determine the extent of liability, if any, that Essar faces for any such shortfall, summary judgment is not warranted in favor of Cleveland-Cliffs on Count One of its Complaint.

**II. Excess Moisture (Counterclaim Count Four)**

Essar claims that Cleveland-Cliffs should be liable to it for damages arising from alleged over-billing based on Cleveland-Cliffs' claimed under-reporting of the moisture content in the delivered product between at least 2010 and 2014. Nothing in the Agreement warranties the moisture content of the pellets except as provided in Section 12. Section 12(a) warranties only two things: (1) that the product with not fall below the LSL or exceed the US as specified in the Agreement; and, (2) that Cleveland-Cliffs will use its best efforts to comply with Section 4(a), which sets forth the AIM specification and requirements for the moisture content of the pellets. Essar does not allege that the pellets failed to conform to the LSL and US requirements set forth

-11-

in the Agreement.[7] Therefore, there is no allegation that the first warranty was breached.

Section 4(a) states that conformity with the AIM pellet specifications shall be measured in accordance with 4©. Section 4© states that compliance with AIM, LSL and US will be determined on a quarterly basis based on the "the kinds of Cliffs Pellets shipped for each quarter, weighted according to the percentage of each kind of Cliffs Pellets to be consumed in such quarter...." Essar does not allege that Cleveland-Cliffs failed to use its best efforts to comply with Section 4(a) which requires material conformity to the average composite specifications set forth in the Agreement. Essar also does not allege that Cleveland-Cliffs failed to measure conformity to the 4(a) specifications quarterly based on the percentage of each kind of pellet shipped and consumed in such quarter. Therefore, they have not stated a claim for a violation of the second warranty provision contained in Section 12(a) of the Agreement.

Cleveland-Cliffs' duties relating to the measuring and reporting of moisture content in the product are outlined in Sections 4 and 11 of the Agreement. Section 4(d)(I) requires Cleveland-Cliffs to report the chemical, physical, and moisture characteristics of its pellets to Essar on the volume of pellets in a vessel as soon as practicably available. Exhibits A-1 and A-2 to the Agreement detail the requirements established in Section 4(a) and (b) of the Agreement specifying the AIM, LSL and US requirements for the moisture content of various types of pellets. Section 11 describes the parties' responsibilities relating to the sampling and

---

[7] Section 12(b) addresses notification requirements should Essar believe there is a material variance from the LSL and US requirements. The parties agree that a material variance, as defined by the Agreement, occurs only if the pellets have a moisture content over 4%. No such variance has been alleged by Essar in this case. Therefore, the notification provisions contained in Section 12(b) are not relevant to the issue before the Court.

measurements used to demonstrate compliance with "typical and average analysis characteristics specified in Section 4." Section 11 makes clear that any testing shall be done by Cleveland-Cliffs, at the loading point, using appropriate ASTM or ISO standard methods, or other procedures and practices mutually agreed upon between the parties.  It also makes clear that "the final values of all characteristics are those determined by Cliffs at the loading point."  Essar is given the right to be present during production and loading, and to observe sampling and analysis performed by Cleveland-Cliffs.  Essar also has the right to do independent testing at its own expense.

Essar has not alleged that Cleveland-Cliffs failed to follow appropriate ASTM or ISO standard methods, or other procedures and practices mutually agreed upon between the parties. It has not alleged that Cleveland-Cliffs failed to do testing, or that it failed to do it at the loading point.  Absent a challenge to these agreed procedures, Section 11 waives any claim Essar may have challenging the measurements reported by Cleveland-Cliffs.  The contract unambiguously states that "the final values of all characteristics are those determined by Cliffs at the loading point."  During arguments at the October 6, 2015 status, Essar argued that the measurement provisions contained in Section 11 apply only to a determination of the quality of the product, not the measured weight or quantity of the product.  This is not supported by the plain language of the Agreement. Section 11 states that it applies to "all pellet sampling procedures and analytical test conducted on Cliffs Pellets sold to Algoma to demonstrate compliance with typical and average analysis characteristics specified in Section 4."  Moisture content is a characteristic specified in Section 4.  The fact that the moisture content may affect pricing as well as quality of the product does not remove it from the measurement and sampling procedure requirements and

agreements set forth in Section 11.  Whatever the consequence of the measurement, it is a measurement of the specified characteristics set forth in Section 4 and is, therefore, ruled by the provisions in Section 11.  Pursuant to Section 11, Essar is, therefore, bound by the measurements provided by Cleveland-Cliffs at the loading point.[8]

Outside of the warranty provisions in Section 12, the material specification requirements set forth in Section 4, and the sampling procedures set forth in Section 11, neither party has identified any other Agreement provision that references pellet moisture content or creates any duty or liability addressing the pricing consequences of moisture content in the pellets. In fact, Essar has not identified any specific term or provision of the Agreement that was breached by any alleged under-statement of the moisture content in the product.  Further, even if the parties had specifically identified a binding agreement on the pricing structure that discounted the cost of the product based on the level of moisture measured, Essar is bound by Cleveland-Cliffs' measurements of the moisture content as determined at the loading point.   Because the Agreement unequivocally states that the characteristics of the product will be determined by

---

[8] Essar claims that it trusted Cleveland-Cliffs to perform proper and accurate measurements and now questions those measurements.  Cleveland-Cliffs, however, is not liable under the contract for Essar's allegedly misplaced trust.  The contract specifically allowed Essar the right to oversee, verify, and otherwise ensure that Cleveland-Cliffs was providing accurate measurements.  If it chose not to take advantage of this opportunity, it cannot hold Cleveland-Cliffs liable for any mistake or inaccuracy that may have occurred due to Essar's lack of oversight.  There is evidence that Essar did work with Cleveland-Cliffs to improve the moisture testing procedures and that this coordination and cooperation led to an improvement in the process by 2014.  This is the type of coordination and cooperation the Agreement allowed, but does not create a cause of action against Cleveland-Cliffs for prior inaccuracies.  There is no evidence that Essar ever refused a shipment or prevented a loaded vessel from delivering pellets based on a belief that the moisture content was under reported at the loading point. Further, as Essar did not do independent testing at the loading point, there is no evidence that Cleveland-Cliffs' loading point measurements were inaccurate at the time they were taken.

Cleveland-Cliffs at the loading point, and because Essar has provided no evidence that Cleveland-Cliffs breached its duties under Section 11 or under the warranty provisions of Section 12 of the Agreement, there is no basis in the contract for the damages sought by Essar in connection with an allegedly under- reported moisture content.  Cleveland-Cliffs' motion for summary judgment on Count Four of Essar's Counterclaim is, therefore, granted.

## **Conclusion**

For the reasons set forth above, Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part.  Essar's Counterclaim based on excessive moisture content in the delivered product (Counterclaim Count Four) is dismissed.  Cleveland-Cliffs' claim for breach of contract based on Essar's failure to satisfy its annual requirements is DENIED.  Essar's defenses to this claim are, however, limited as set forth above.  IT IS SO ORDERED.

   /s/ Donald C. Nugent
DONALD C. NUGENT
United States District Judge

DATED:  October 7, 2015